**The court incorporates by reference in this paragraph and adopts as the findings and analysis of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



Dated: July 29 2011

Mary Ann Whipple
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No.: 09-37597 |
| | ) | |
| Troy M. Hahn and | ) | Chapter 7 |
| Stacey Hahn, | ) | |
| | ) | Adv. Pro. No. 10-3041 |
| Debtors. | ) | |
| | ) | Hon. Mary Ann Whipple |
| Transportation Equipment | ) | |
| Sales Corporation, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| Troy M. Hahn, | ) | |
| | ) | |
| Defendant. | | |

### MEMORANDUM OF DECISION

This adversary proceeding is before the court for decision after trial on a complaint filed by Plaintiff Transportation Equipment Sales Corporation ("Plaintiff" or "TESCO") to determine dischargeability of a debt allegedly owed to it by Defendant Troy M. Hahn. Plaintiff alleges that the debt should be excepted from discharge under 11 U.S.C. § 523(a)(4) and (a)(6).[1]

---

[1] In its complaint, Plaintiff also alleges that the debt is nondischargeable under § 523(a)(2)(A). However, at trial, that claim was abandoned.

The district court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §1334(b) as a civil proceeding arising in or related to a case under Title 11. This proceeding has been referred to this court by the district court under its general order of reference. 28 U.S.C. § 157(a); General Order 84-1 of the United States District Court for the Northern District of Ohio. Proceedings to determine dischargeability of debts are core proceedings that the court may hear and decide. 28 U.S.C. § 157(b)(1) and (b)(2)(I). This Memorandum of Decision constitutes the court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52, made applicable to this adversary proceeding by Fed. R. Bankr. P. 7052.

Regardless of whether specifically referred to in this Memorandum of Decision, the court has examined the submitted materials, weighed the credibility of the witnesses, considered all of the evidence, and reviewed the entire record of the case. Based upon that review, and for the reasons discussed below, the court finds that a debt owed by Defendant Troy Hahn to Plaintiff in the amount of $23,500 is nondischargeable under § 523(a)(6).

## FINDINGS OF FACT

TESCO is a small, family-owned company located in Oregon, Ohio. It is in the business of buying and selling new and used buses. Defendant was employed by TESCO from February 2003 until May 1, 2006. TESCO's claims are based upon Defendant's conduct during his employment.

Defendant was twenty-one years old at the time he was hired to work at TESCO. He had no experience in the bus business prior to working at TESCO. Although TESCO has no formal training program, Defendant reported directly to Noel "Budd" Graham, Jr. ("Graham"), currently the president of the company and the vice-president of sales while Defendant was working there. Graham taught him the nuts and bolts of the used bus business and had ongoing daily contact with Defendant. Defendant's responsibilities included working with customers who wanted to purchase a used bus and negotiating the sale, as well as finding used buses to be purchased by TESCO as inventory for later sale. Graham trained Defendant as to the type of used bus TESCO would purchase for resale. Graham testified that TESCO is not a junk bus dealer. Thus, Defendant was instructed as to which manufacturers produced buses of the quality that TESCO was interested in purchasing and the specific features of those buses to be evaluated by Defendant. The specific features to be evaluated included mileage, interior and exterior condition of the vehicle, tires, and the mechanical condition of the vehicle. It was Defendant's duty to properly evaluate a prospective bus for purchase and to ensure that the bus was in good mechanical condition before asking Graham for approval of its purchase. According to Graham, Defendant knew well the buses that TESCO was interested in and would not bring a vehicle to him that did not meet the company's specifications.

2

TESCO obtains leads for purchasing used buses through internet inquiries from its website, direct mailing and phone calls. According to Graham, the ability to obtain these leads has developed as a result of the Graham family being in the bus business since 1937. Leads were then passed along to Defendant, who was responsible for evaluating a bus for purchase. In addition to the leads obtained from TESCO, Defendant would also conduct internet research, particularly on Ebay, to find potential buses for purchase.

At the time Defendant was hired in February 2003, he signed an employment agreement that included the following provision:

> The Employee shall devote his undivided time and best efforts to the faithful and diligent performance of his duties assigned to him by the Corporation. Employee agrees not to actively engage in any other business or to connect or associate himself with any other business or enterprise, directly or indirectly during the term of this contract without prior approval of Corporation; this provision is not intended to prevent Employee's investing in businesses which are not in competition with any businesses conducted by the Corporation, so long as he does not take any active part in the actual management, operations or functions thereof.

[Pl. Ex. 1, ¶ 5]. Defendant testified that no one at TESCO explained the terms of the employment agreement to him before signing and that he did not receive a copy of the agreement until after his employment was terminated. Nevertheless, the court credits Graham's testimony that because he was sharing trade secrets with Defendant, he did speak to Defendant about the non-compete provision of the employment agreement.

Notwithstanding the provisions of the employment agreement, it is undisputed that Defendant engaged in business activities with Columbus Avenue Sales, LLC ("CAS"), a competitor of TESCO, during his employment at TESCO. Monte Porter, a friend of Defendant, is the sole member of CAS, which was formed in February 2005 for the purpose of buying and selling used vehicles. Prior to starting the business, Porter testified that he spoke to Defendant about starting a used bus business; however, Porter had no experience in buying and selling buses. CAS was only in business for approximately eighteen months, closing in or around August 2006.

It is undisputed that while CAS was in business, Defendant provided leads to Porter on potential buses for purchase. It is also undisputed that, during that time, CAS sold between thirteen to eighteen vehicles, at least thirteen of which were buses purchased after being referred by Defendant and for which Defendant personally received from CAS referral fees in the total amount of $40,809.68. [*See* Pl. Ex. 8-001 through 8-022]. Although Plaintiff argues that a check made out to "Cash" in the amount of $3,000 on May 24, 2006, was also a referral fee paid to Defendant, there is no evidence or testimony so indicating. [*See* Pl. Ex. 8-024]. CAS's check register itself simply describes the payment as "expenses," whereas other entries

of payments to Defendant included Defendant's name and, where a description was included, described the transaction as "subcontract." [*Id.*]  In addition, the court credits the testimony of both Defendant and Porter that an additional payment by CAS to Defendant on December 13, 2005, in the amount of $3,443.97 was a payment for cooling units that Defendant sold to Porter, not a referral fee as argued by Plaintiff. [*See* Pl. Ex. 8-012].

Although Defendant testified that it was common practice to refer buses that TESCO did not want to other dealers, Graham testified that TESCO never made such referrals.  And, according to Amy Myers, a former investigator for the Ohio Bureau of Motor Vehicles, it is illegal to refer vehicles to another dealer for profit.  Nevertheless, the court credits Defendant's testimony that he was unaware of the illegality of his conduct.

Defendant admitted that he in fact referred the buses and received the above stated referral fees but testified that the buses referred were not buses that TESCO was or would have been interested in purchasing.  According to Defendant, he approached Graham regarding purchase of the buses before referring them to CAS.  The court does not find this testimony credible and, instead, credits Graham's testimony that, with the exception of one bus that a former customer offered to TESCO to purchase, none of the referred vehicles were presented to him for purchase approval.

With respect to that one bus, the evidence is clear that TESCO was interested in purchasing it.  In January 2006, Debra Brescol, executive director of Bedford Public Schools Health Van, a former customer to whom TESCO had sold the bus in 2001, contacted TESCO to determine whether TESCO would be interested in purchasing the used bus ("the Bedford bus").  Brescol testified that she spoke to Defendant and told him that the organization wanted $18,000 for the bus and Defendant told her that TESCO would be interested in purchasing it.  According to Graham, "the transaction was in place" at an agreed price of $18,000.  However, Brescol then learned that the Bedford Public School Board policy required a sealed bid process for selling anything over $5,000.  She, therefore, called TESCO and informed it that she would have to advertise the bus for sale, and it would have to submit a bid.  Defendant testified that he told Porter about the bidding that was to take place.  Although he testified that he did not tell Porter what amount to bid, Defendant admitted that he told him that TESCO would not pay more than $18,000.

After running the ad, Brescol received only two bids – one submitted by Defendant on behalf of TESCO in the amount of $17,990, [Pl. Ex. 9-002], and one submitted on behalf of CAS in the amount of $18,001, [Pl. Ex. 9-003].  Graham testified that it is "extremely rare" to submit a bid that is not a rounded number such as the bid submitted by Defendant.  In any event, TESCO lost the bid, and CAS purchased the

4

bus. Thereafter, CAS sold the bus for $27,000. [*See* Pl. Exs. 7-040 to 7-043]. Two days after depositing the proceeds in its checking account, CAS wrote a check to Defendant in the amount of $2,150, which amount Defendant admits was a referral fee. [*See* Pl. Ex. 8-016].

In addition to the Bedford bus, as discussed above, Defendant referred at least twelve additional buses to CAS for purchase. The record before the court includes the title history provided by the Ohio Bureau of Motor Vehicles for thirteen vehicles purchased by CAS between July 12, 2005, and April 25, 2006, that were subsequently sold by CAS. [*See* Pl. Ex. 7]. Although the title history does show the price received by CAS on the sale of each of those vehicles, with the exception of two buses, the record is silent as to the price paid by CAS for the vehicles and, thus, as to the profit CAS realized on the sales. Nevertheless, again with the exception of the same two buses, and notwithstanding the fact that Defendant referred the majority of the up to eighteen vehicles purchased and sold by CAS, there is no evidence connecting any particular vehicle to a vehicle referred to CAS by Defendant. Not surprisingly, both Defendant and Porter claim no memory of any facts connecting specific buses purchased and sold by CAS to Defendant.

Notwithstanding their lack of memory, with respect to two of the buses for which a title history is provided, a purchase contract signed by Porter indicates that the purchaser of the buses is CAS and includes both Porter's and Defendant's name and phone number under the purchaser's information. [*See* Pl. Ex. 10]. The first bus, a 2001 Ford E450 with a vehicle identification number ending in 4766, was purchased by CAS for $14,000 and subsequently sold for $17,000. [*See id.*; Pl. Ex. 7-018 to 021]. The second bus, a 1998 Ford E350 with a vehicle identification number ending in 8904, was purchased by CAS for $10,000 and subsequently sold for $19,750. [*See* Pl. Ex. 10 & Ex. 7-013 to 016].

According to both Jeff Pappas, executive vice president of TESCO, and Graham, TESCO would have been interested in purchasing all of the vehicles referred to CAS by Defendant, including the two buses discussed above. Pappas testified that the buses met all of TESCO's specifications for purchase – less than five years old, low mileage, made by a preferred manufacturer with a specific configuration, capacity, body and chassis. Pappas's testimony was based on his review of computer records of types of buses TESCO sells. However, the court also credits Defendant's testimony that additional factors are considered in determining whether TESCO would be interested in purchasing any particular bus at any particular time. Those factors include the overall condition of the vehicle, the cost to refurbish the vehicle, the inventory of used buses, and the availability of funds to purchase the bus. Defendant explained that all of TESCO's used bus purchases are cash purchases and are never financed. Graham also agreed that the condition of

5

the vehicle is a factor and testified that if his salesperson is doing a proper evaluation of the vehicle, he should catch any problems. Jim Zsigray, controller for TESCO, testified that, although refurbishing costs may be incurred before selling a bus, it would be unusual for TESCO to incur more than $1,000 in such costs for buses purchased by it.

In this case, neither Pappas nor Graham ever saw or evaluated any of the buses referred to CAS by Defendant. And there is no evidence reflecting the condition of any of those vehicles or the cost of any refurbishing of those vehicles for sale. The record is also silent as to both the inventory of used buses at TESCO at the time the referred buses became available for purchase and the funds, if any, that would have been available to purchase those buses at that time. Given this lack of evidence, the court finds no basis for, and does not credit, the testimony of Pappas and Graham that TESCO would have purchased the two buses with vehicle identification numbers ending in 4766 and 8904 or, with the exception of the Bedford bus, any of the other buses referred to CAS by Defendant. The court finds their testimony on this point speculative.

In addition to referring buses to CAS for purchase, on at least one occasion, Defendant presented a bus owned by CAS to Graham for purchase by TESCO. By January 2006, Defendant had worked at TESCO for three years. Graham considered him a seasoned veteran in the used bus sales business and relied on him to do the necessary research on vehicles for TESCO to purchase, which would include obtaining a carfax to reveal accidents in which the bus had been involved. After doing such research, Defendant would approach Graham with the information along with his suggested purchase price and sale price. Typically, Graham would not see the bus before authorizing its purchase, as he trusted Defendant in light of his experience.

On January 4, 2006, Defendant sought Graham's authorization for a bus recently purchased by CAS by submitting a request for issuance of a check for the purchase of the bus. [*See* Pl. Ex. 11-02]. However, instead of requesting a check payable to CAS, he requested that the check be made payable to Amanda Kelly, Porter's sister. Although there is some dispute as to whether it was Porter's or Defendant's idea to put the bus in Kelly's name, Defendant clearly knew that the transfer to Kelly was to be made. Defendant also knew that he should not be doing business with a competitor. The court finds that the purpose of the transfer to Kelly was to prevent Graham from learning the true identity of the party with whom Defendant was asking TESCO to do business. On January 5, 2006, at her brother's request, a purchase agreement was executed by Kelly reflecting a purchase of the bus ("the Kelly bus") from CAS for $3,000, and title was transferred to Kelly. [*See* Pl. Ex. 11-01]. Kelly testified that she actually paid nothing and never even saw the bus.

6

In conjunction with the request for the check, Defendant provided Graham a print out from Ebay with a description of the vehicle, which also included his handwritten suggestion of a $15,500 purchase price by TESCO and a price that he would use to market the bus to TESCO customers of $23,990. [*See* Pl. Ex. 12-01 to 02]. He assured Graham that the Kelly bus was a good vehicle. Graham approved the purchase by TESCO and, on January 5, 2006, issued a check payable to Amanda Kelly in the amount of $15,500. Although Kelly's name appears as the endorser of the check, she never received the check. Porter admitted that he, in fact, signed Kelly's name on the back of the check. The check was deposited in a CAS account on January 6, 2007. Defendant then received a referral fee for the sale to TESCO in the amount of $3,478.71.

Although not provided to Graham at the time of Defendant's request for authorization to purchase the Kelly bus, a carfax on the bus reveals that it had been involved in four accidents prior to TESCO's purchase of the bus. According to Graham, the bus "has a horrible shimmy in the front end" and the engine is bad. The bus, to this day, is still on the TESCO lot and, according to Graham, is not saleable. Graham did not see the Kelly bus until after Defendant's employment at TESCO was terminated and he began researching the buses that Defendant had caused to be acquired by TESCO.

On February 24, 2006, Defendant submitted a second request to Graham for authorization to purchase another bus from Amanda Kelly. He requested a check payable to Amanda Kelly and, in parentheses, noted "Kelly Auto Brokers." Kelly testified that she has never been associated with a "Kelly Auto Brokers." Graham did not authorize this purchase because the entrance to the bus was not right across from the driver but was located halfway back on the vehicle. Graham testified that it was odd that Defendant would submit such a request because it did not meet TESCO's general purchase specifications and TESCO had never purchased such a vehicle in the past.

Notwithstanding Defendant's relationship with CAS, his bus sales at TESCO in 2005 totaled approximately $1.3 million, up from $1.1 million in 2004. Defendant testified that prior to his employment being terminated, he was on track in 2006 to have another record year. According to Graham, Defendant's sales were good, and he had had no disciplinary issues involving Defendant. Nevertheless, after learning of Defendant's involvement with CAS and, in light of the non-compete provision of Defendant's employment contract, Defendant's employment was terminated on May 1, 2006.

## LAW AND ANALYSIS

TESCO seeks a determination that Defendant owes it a debt that is nondischargeable under 11 U.S.C. § 523(a)(4) and (a)(6). A creditor must prove exceptions to dischargeability by a preponderance of

the evidence. *Grogan v. Garner,* 498 U.S. 279, 291(1991). Exceptions to discharge are to be strictly construed against the creditor and liberally in favor of the debtor. *Rembert v. AT&T Universal Card Servs. (In re Rembert),* 141 F.3d 277, 281 (6th Cir. 1998).

**I. 11 U.S.C. § 523(a)(6)**

Plaintiff argues that Defendant owes it a debt for economic damages sustained by it as a result of Defendant's "aggravated" breach of his employment contract, specifically, the covenant not to compete, and usurpation of TESCO's business opportunities and that such debt is nondischargeable under § 523(a)(6). Section 523(a)(6) provides that a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity" is not dischargeable. 11 U.S.C. § 523(a)(6). In order to be entitled to a judgment that the debt is excepted from discharge, Plaintiff must prove by a preponderance of the evidence that the injury from which the debt arises was both willful and malicious. *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 463 (6th Cir. 1999); *J & A Brelage, Inc. v. Jones (In re Jones)*, 276 B.R. 797, 801-2 (Bankr. N.D. Ohio 2001).

Addressing the "willful" requirement of § 523(a)(6), the Supreme Court has specifically held that "nondischargeability takes a deliberate or intentional *injury,* not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998). Relying on the *Geiger* analysis, the Sixth Circuit concluded that "unless 'the actor desires to cause consequences of his act, or . . . believes that the consequences are substantially certain to result from it,' . . . he has not committed a 'willful and malicious injury' as defined under § 523(a)(6)." *Markowitz*, 190 F.3d at 464 (internal citation omitted). Although a simple breach of contract will not ordinarily support a finding of nondischargeability of the debt for damages resulting from such breach, where a plaintiff "prove[s] that the defendant 'intended to cause harm by' breaching the contract," the debt may be found nondischargeable. *Spring Works, Inc. v. Sarff (In re Sarff)*, 242 B.R. 620, 626 (B.A.P. 6th Cir. 2000).

In addition to proving a "willful" injury, Plaintiff must also demonstrate that Defendant acted maliciously. Even absent personal malevolence, a person will be found to have acted maliciously when that person acts in conscious disregard of his or her duties or without just cause or excuse. *Monsanto Co. v. Trantham (In re Trantham)*, 304 B.R. 298, 307 (B.A.P. 6th Cir. 2004) (citing *Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir. 1986)).

TESCO argues that Defendant owes it a debt for willful and malicious economic injuries incurred as a result of Defendant's breach of his non-compete agreement and usurpation of TESCO's business opportunities. Specifically, TESCO asserts that Defendant owes it $84,502.65, which amount consists of

8

the fees received by him for referring buses to CAS,[2] the $12,750 profit in the sale by CAS of the two buses with vehicle identification numbers ending in 4766 and 8904, a $9,000 profit in the sale by CAS of the Bedford bus, and $15,500, representing the price TESCO paid for the Kelly bus.

**A. Buses Referred by Defendant to CAS**

There is no dispute that CAS was a competitor of TESCO and that Defendant breached his covenant not to compete with TESCO by referring buses to CAS. And under Ohio law,

> [o]ne who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of
>
> (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or
>
> (b) preventing the other from acquiring or continuing the prospective relation.

*Akron-Canton Waste Oil, Inc. v. Safety-Kleen Oil Serv., Inc.*, 81 Ohio App. 3d 591, 598 (1992) (quoting 4 Restatement of the Law 2d, Torts (1979) 20, Section 766B). "The term 'contractual relation' includes not only formal agreements but encompasses advantageous business transactions in general." *Id*.

In this case, with respect to buses referred to CAS by Defendant, the evidence supports only a finding that TESCO sustained an injury as a result of Defendant breaching the covenant not to compete and interfering with TESCO's prospective business relationship when he ensured that CAS, rather than TESCO, purchase the Bedford bus. The owner of the Bedford bus was a former customer of TESCO and had contacted TESCO to purchase the bus. Defendant knew TESCO wanted to purchase the bus and was instructed to enter a bid of $18,000, the price TESCO was told that the seller would accept. Defendant not only told Porter about the bus but also ensured the submission by Porter, on behalf of CAS, of a higher bid than TESCO. As only TESCO and CAS submitted bids, the court finds that Defendant prevented TESCO from consummating the business transaction. That the transaction would have been advantageous to TESCO is shown by the fact that CAS sold the Bedford bus for $27,000, yielding a gross profit of $9,000. The court credits Zsigray's testimony that, although refurbishing costs may be incurred before selling a bus, it would be unusual for TESCO to incur more than $1,000 in such costs. Thus, the court finds it more likely than not that TESCO suffered an economic injury resulting from Defendant's breach of the covenant not to compete and interference with a prospective business relationship in the amount of $8,000.

---

[2] TESCO contends that Defendant's referral fees total $47,253.65. However, as discussed in the court's findings of fact, TESCO has proven only $40,809.68 was paid to Defendant as referral fees.

The court further finds that this injury was both willful and malicious. While there is no evidence that Defendant's actions were motivated by an intent to harm TESCO, he clearly knew that the consequence of his conduct -TESCO being deprived of any profit on a subsequent sale of the bus - was substantially certain to occur. Such knowledge is sufficient to find a willful injury under *Markowitz*. In addition, Defendant acted in conscious disregard of his contractual duties and without just cause by aiding a competitor behind his employer's back for his own personal gain. The $8,000 debt owed to TESCO is, therefore, excepted from Defendant's discharge as one for a "willful and malicious injury." 11 U.S.C. § 523(a)(6).

However, the evidence is insufficient to find that Defendant owes TESCO a debt for damages as to the other buses referred by him to CAS. In order to find that TESCO suffered economic injury due to Defendant's breach of contract and interference with prospective business opportunities, the court must find that TESCO would have, in fact, purchased the other buses referred by Defendant. Although both Pappas and Graham testified that TESCO would have purchased all of the referred buses, as discussed earlier, the court finds their testimony speculative and unpersuasive as it was based only on information regarding the age, mileage, manufacturer, specific configuration and capacity of the buses. Neither Pappas nor Graham had ever seen or evaluated the specific mechanical and physical condition of any of the referred buses. That such an evaluation is necessary was made clear by Graham's testimony that it was Defendant's duty to properly evaluate a prospective bus and ensure that the bus was in good mechanical condition before asking Graham for approval of its purchase. Not only is the record silent as to the condition of the buses, with the exception of the two buses with vehicle identification numbers ending in 4766 and 8904, there is no evidence even connecting any particular bus to a bus referred to CAS by Defendant.

Furthermore, even if TESCO had shown that it would have purchased all of the referred buses, the referral fees sought by TESCO as damages resulting from Defendant's breach of his covenant not to compete and usurpation of its business opportunities are not fees that TESCO would have otherwise been entitled to receive since such referral fees are illegal. Thus, they do not constitute economic damages incurred by TESCO as a result of Defendant referring buses to CAS. *See Rhodes v. Rhodes Indus., Inc.*, 71 Ohio App.3d 797, 809 (1991) ("Damages include the compensation a non-breaching party would have received if the contract had been performed"). Although lost profits may be a proper measure of damages, except for the two buses with vehicle identification numbers ending in 4766 and 8904, there is no evidence

10

of the profit realized by CAS from the sale of the buses.[3]

### B. Kelly Bus Transaction

It is clear that TESCO has suffered an economic injury in the amount of $15,500, the purchase price it paid, as a result of purchasing the Kelly bus, which is mechanically deficient and cannot be sold. And it is equally clear that Defendant intentionally misled TESCO as to the identity of the true seller. The question, however, is whether the economic injury that it suffered was willful and malicious. For the following reasons, the court concludes that it was.

Although Defendant testified that he took Porter's word that the bus was "a good bus," his testimony is not credible. Defendant knew Porter had no experience in the bus business. The mechanical defects of the bus included "a horrible shimmy in the front end" as described by Graham that would have been apparent to both Defendant and Porter. And a carfax, which was readily available to Defendant, shows that the bus had previously been involved in four accidents. The Kelly bus was the only bus sold by CAS to TESCO and was one of only two buses owned by CAS that Defendant requested Graham's authorization to purchase. The second bus for which Defendant requested such authorization was a bus that did not meet TESCO's specifications for purchase either as its entrance door was not located across from the driver's seat where most customers prefer it to be located. This fact, however, became apparent when Graham viewed a picture of the bus and authorization was not given. Nevertheless, it is clear that the only buses owned by CAS that Defendant ever requested Graham's authorization to purchase for TESCO were buses that would pose more difficulty in selling, either because of obvious mechanical difficulties or because of a smaller customer base. Defendant was the only used bus sales person at TESCO, and Graham had placed great trust in him to properly evaluate any bus to be purchased.

All of these facts, and the length to which Defendant and Porter went to conceal the true seller of the Kelly bus, lead the court to conclude that Defendant and Porter conspired to unload a bus that CAS could not sell on an unsuspecting victim, TESCO. This was only possible because of the trust Graham placed in Defendant to conduct TESCO's used bus business, as evidenced by the fact that Graham did not personally inspect the buses either before or after their purchase. The court further concludes that the economic injury sustained by TESCO was substantially certain to have occurred as a result of Defendant's conduct and that, by conspiring with Porter, Defendant acted in conscious disregard of his contractual duties so as to support a determination that a debt is owed by Defendant in the amount of $15,500 that is

---

[3] The court also notes that the record is silent as to how CAS calculated Defendant's referral fees (i.e. whether they were based on CAS's profit in the sale of the buses).

11

nondischargeable under § 523(a)(6).

## II. 11 U.S.C. § 523(a)(4)

TESCO also alleges that the debt owed to it by Defendant is nondischargeable under § 523(a)(4). At trial, it argued only that the debt owed for injury resulting from the Kelly bus transaction is nondischargeable under this subsection.

Under § 523(a)(4), a debt is excepted from discharge if it is a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." The Sixth Circuit has adopted a narrow interpretation of "fiduciary" as used in § 523(a)(4). *R.E. America, Inc. v. Garver (In re Garver)*, 116 F.3d 176, 179 (6th Cir. 1997). In order to trigger the fraud or defalcation provision in that subsection, a debtor must hold funds in a trust for the benefit of a third party. *Id.* The Kelly bus transaction does not fall within this exception as there is no allegation or proof of the requisite fiduciary relationship, which "turn[s] on the existence of a pre-existing express or technical trust whose res encompasses the property at issue." *Commonwealth Land Title Co. v. Blaszak (In re Blaszak)*, 397 F.3d 386, 391 (6th Cir.2005). Although an ordinary agency-principal relationship can involve fiduciary duties, such a relationship standing alone is insufficient to establish the type of fiduciary duty contemplated by § 523(a)(4). *Id.* (stating that "the mere failure to meet an obligation while acting in a fiduciary capacity does not rise to the level of defalcation" under § 523(a)(4)).

Debts may also be nondischargeable under the embezzlement or larceny provision of § 523(a)(4) for which there is no requirement to prove fiduciary capacity. *See Peavey Electronics Corp. v. Sinchak (In re Sinchak)*, 109 B.R. 273, 276 (Bankr. N.D. Ohio 1990) (stating the element of "fiduciary capacity" in § 523(a)(4) refers only to "fraud or defalcations" and need not be present where embezzlement is the exception relied upon). The Sixth Circuit defines embezzlement for purposes of § 523(a)(4) as "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1172-73 (6th Cir. 1996). A creditor proves embezzlement by establishing that (1) he entrusted his property to the debtor or debtor lawfully obtained the property, (2) the debtor appropriated the property for a use other than that for which it was intended, and (3) the circumstances indicate fraud. *Id.* at 1173. For purposes of § 523(a)(4), larceny is defined as "the fraudulent and wrongful taking and carrying away of the property of another with intent to convert such property to the taker's use without the consent of the owner." *Graffice v. Grim (In re Grim)*, 293 B.R. 156, 165-66 (Bankr. N.D. Ohio 2003) (citing *Schreibman v. Zanetti-Gierke (In re Zanetti-Gierke)*, 212 B.R. 375, 381 (Bankr. D. Kan. 1997)). Embezzlement differs from larceny only in that the original

12

taking was lawful.

In this case, the Kelly bus transaction involves neither larceny nor embezzlement. Both larceny and embezzlement require Defendant to have taken Plaintiff's property. Although Defendant facilitated the sale of the Kelly bus to TESCO and benefitted from that sale by receiving a referral fee from Porter, Defendant never obtained, lawfully or otherwise, property of Plaintiff. The $15,500 check for the purchase of the Kelly bus was made payable to Amanda Kelly and was cashed by Porter and deposited into his account.

## **CONCLUSION**

For the foregoing reasons, Plaintiff has sustained its burden under 11 U.S.C. § 523(a)(6) only with respect to debts owed to it by Defendant Troy M. Hahn for economic injuries it sustained due to the referral of the Bedford bus to CAS and as a result of the Kelly bus transaction, which debts total $23,500. Plaintiff is entitled to judgment in its favor and against Defendant Troy M. Hahn in this amount and to a declaration that this debt is nondischargeable under 11 U.S.C. § 523(a)(6). However, Plaintiff having abandoned its claim under 11 U.S.C. § 523(a)(2), and having failed to meet its burden with respect to its claim under 11 U.S.C. § 523(a)(4), judgment will be entered in favor of Defendant Troy M. Hahn on those claims.

A separate judgment in accordance with this Memorandum of Decision will be entered by the court.